O’NIELL, C. J.
 

 The plaintiff has appealed from a judgment rejecting his demand for damages for breach of contract. ' He contracted to sell, and the defendant to buy, a quantity of timber, “to be not less than 1,000,000 feet nor more than 2,000,000 feet,” to be delivered on the N. O. & N. W. R. R. between Rayville and Gilbert, La., or at such other place as the buyer might designate; deliveries to be made between the date of the contract, March 26th and November 1st, all logs to be inspected and scaled or measured by buyer, at the loading places on the railroad right of way every 15 days, measurements to be according to Doyle Rule. The kind of timber stipulated was gum, oak, elm, ash, cypress, pecan and sycamore, measuring 12 to 16 inches and up; and the price stipulated was $35 per M feet.
 

 Lee commenced promptly the delivering of the logs on the railroad right of way, where
 
 *1068
 
 they.were inspected, measured- and accepted by the box : company regularly, until the 2d day of September, at which time more than the minimum limit of 1,000,000 feet of timber, but not quite the maximum limit of 2,-000,000 feet, had been delivered. On that daté, which was 30 days before the expiration of the'dime limit for delivering the logs, the box company wrote
 
 k
 
 letter to Lee, viz.: “We notice by our figures that you have about completed your contract with us for timber. We are sending our scaler over in the morning to take up what you have delivered to the track, which we feel is all that we can possibly "accept on this contract.” Lee immediately notified the box company; on receipt of the letter, that he would continue the hauling and delivering of the logs until he had delivered the maximum quantity of 2,000,-000 feet; and he did continue hauling, and cláims to have delivered all of the 2,000,000 feet of logs before the term of the contract expired. The box company sent its log scaler out to the places of delivery, and, on the 6th, 7th and 8th óf 'September, he measured -and accepted logs which had been delivered previous to the 2d of September. He refused to measure 'á' number of logs which he claimed were 'not accessible, for loading on the railroad car's','and'demanded that Lee move them to an accessible place. Lee moved the logs, as requested, and the scaler returned and measured and'accépted them for the box company on the 30th of October, the last day before the expiration of the contract. Lee then insisted that the scaler should measure and accept the logs delivered subsequent to the'receipt of thé‘box company’s letter of the 2d of Séptember., The scaler communicated'with his company by telephone, and, on the company’s instructions, refused to scale any logs delivered by Lee after his receipt of the company’s letter of the 2d of September. The- -scaler- admitted in his testimony that there were at the place of delivery, on the 30th of October, 40,000 or 50,000 feet of logs which Lee had delivered subsequent to his receiving the company’s letter of the.2d of-September, attempting to put an end to the contract. Lee testified that he afterwardshad the logs measured, and that there were 162.000 feet of logs which he had delivered after the 2d of September, and which the box company had refused to accept. A witness for Lee testified that he (the witness) had assisted in the measuring of 30,000 feet of^the timber lef-t on the right of'way, and another witness testified that he had assisted in the measuring of one lot of logs containing 130,-000 feet and another lot containing 32,000 feet. Lee therefore sued for $5,600, being the value of 160,000 feet of timber at $35 per thousand. It was admitted in the defendant’s answer that the quantity of timber delivered by Lee previous to his receipt of the company’s letter of the 2d of September, and accepted and paid for by. the company, was 1.840.000 feet. Therefore, if Lee did deliver 160.000 feet of logs on the railroad right of way after receiving the letter of the 2d of September, and before the 1st of November,, and if the company was bound by the contract to accept all logs delivered during the term of the contract, up to the maximum limit of 2,000,000 feet, Lee’s suit for the price of the 160,000 feet of timber is well founded. 1-Ie tried to sell to other mills the logs which-the box company left on the railroad right of way, but there was no market for them in that vicinity, and so they remained on the ground until they rotted or were washed-away by floods. The evidence leaves some, doubt, however, about -the quantity of timber on the railroad right of way on the 30th of October, delivered by Lee after the 2d of September. Taking the admission of the box company’s scaler that the quantity, was 40,-000 or 50,000 feet, together with the-testimony
 
 *1070
 
 of and for the defendant, that the quantity was much greater than 50,000 feet, we consider it proven that the quantity was as great as 50,000 feet.
 

 The reason given hy the district judge for rejecting the plaintiff’s demand was that he (the judge) held that the contract was valid only for the delivery and acceptance of 1,000,-000 feet of logs, that Lee was not obliged to deliver any more than he saw fit to deliver, and that the box company was not obliged to accept any more than it saw fit to accept, of the second million feet of logs, and that the box company therefore had the right to quit receiving the logs at any time after receiving 1,000,000 feet.
 

 The box company contends that the contract was null for the further reason that there was no stipulation as to how many feet bf each of the several kinds of timber, gum, oak, elm, ash, cypress, pecan and sycamore, should be delivered. The contract was not invalid for uncertainty in that respect, especially as the price was the same on all of the kinds of timber mentioned. Lee was bound to deliver, within the .time stipulated, and the box company was bound to accept within the time stipulated, any one' or all of the kinds of timber stipulated,' no matter how the several kinds might have been apportioned, provided, of course, that Lee was obliged to deliver at least 1,000,000 feet and the box company was not obliged to' accept more than 2,000,000 feet of the kinds of timber stipulated.
 

 A contract for the sale of a specified commodity, where, for the protection of either the seller or the buyer, the quantity to be sold or bought is not stated more definitely than within a specified minimum and maximum limit, is not invalid for uncertainty as to the quantity. The rule governing such contracts is stated in 35 Cyc. 205, verbo. “Sales,” thus:
 

 “If the quantity to be delivered is stated in indefinite terms, merely 'a maximum and a minimu'm limit being fixed, to constitute a sufficient delivery the seller must deliver at least the quantity specified as the minimum limit, and within those limits the buyer is bound to accept the delivery, but he is not bound to accept a delivery in excess of the maximum limit; and on the other hand the seller is not obliged to deliver in excess of such limit.”
 

 The rule is stated by Mechem, vql. II, pp. 1023, 1024, §§ 1170 and 1171, viz.,:
 

 ■' “The precise amount to be furnished may also be left to.be determined by one of the parties; and his determination, when made and manifested, fixes the quantity to which the contract applies; It may thus be at the option of either to deliver or demand ‘up to’ a certain quantity, or ‘from’ one quantity ■ ‘to’ 'another, or ‘between’ one quantity and another. In the former case, while there is a maximum there is no minimum limit; • in the two latter cases, the extremes are limited but the precise quantity may be anything included in or between the limits fixed.
 

 “The contract may expressly determine which party is entitled to exercise the option and determine the quantity; but, in the absence of express agreement, it must be determined from the nature of the case, and in this respect the rule laid down by the authorities is that, when, from the nature of an agreement, an election is to be made, the party who is by the agreement to do the first act, which, from its nature, cannot be done till the election is determined, has authority to make the choice in order that he may be able to do that first act, and, when once he has done that act, the-election has been ir
 
 *1072
 
 revocably determined, but till then he may change his mind.”
 

 The author cites, in support of the text which we have quoted, a Maine case, where the agreement was for the sale of “from one to three thousand bushels of potatoes,” to be delivered at a certain place; and it was held that the seller had the right to deliver any quantity he chose within the limits fixed, and that he was not bound to make his election until the potatoes 'arrived at the place of delivery, though requested by the other party after the shipment was made. Small v. Quincy, 4 Me. (4 Greenl.) 497. The author cites also a New York case, where the contract was for the sale of “from seven hundred to one thousand barrels” of meal, by the 1st day of May, and the seller, before that date, delivered 700 barrels, and also before that date tendered 300 barrels more, which the buyer refused to receive; and it was held that the buyer was bound to take and pay for the 1,000 barrels, that the delivery of any quantity from 700 to 1,000 barrels was at the seller’s option and for his benefit. Disborough v. Neilson, 3 Johns. Cas. (N. Y.) 81. The author refers also to Benjamin on Sales (6th Am. Ed.) 359, and Blackburn on Sales, p. 128, and cites a Virginia case (White v. Toncray, 9 Leigh, 347), where it was held that a contract between a carrier and a salt manufacturer, whereby the carrier agreed to transport from 1,200 to 5,000 barrels of salt annually, gave the manufacturer and not the carrier the right to elect what quantity, not less than 1,200 nor more than 5,000 barrels, should be transported by the carrier annually.
 

 In Wheeler v. New Brunswick & Canada R. R. Co., 115 U. S. 29, 5 S. Ct. 1061, 1160, 29 L. Ed. 341, where the contract was for “two (2) to six hundred tons [of old rails], for delivery in New York or New Haven, between August 1st and October 1st, at $28,” it was held:
 

 “An agreement to accept from two to six hundred tons, is an agreement to accept any number between the expressed limits, the option being with the seller.”
 

 Defendant’s counsel cite Minneapolis & St. Louis Railway Co. v. Columbus Rolling Mill Co., 119 U. S. 149, 7 S. Ct. 168, 169, 30 L. Ed. 376. In that case the railway company wrote the rolling mill: “Please quote me prices for 500 to 3,000 tons 50-lb. steel rails, and for 2,000 to 5,000 tons 50 lb. iron rails, March, 1880, delivery.1!’ The rolling mill replied: “We do not make steel rails. Eor iron rails, we will sell 2,000 to 5,000 tons of 50-lb. rails for fifty-four ($54) dollars per gross ton, for spot cash, f. o. b. cars at our mill, March delivery.” The railway company replied: “Please enter our order for twelve hundred tons rails, March delivery, as per your favor of the eighth. Please reply.” The rolling mill replied: “We cannot book your order at present at that price.” The railway company replied: “Please enter an order for two thousand tons rails as per your letter of the sixth” — meaning the eighth, and referring to the letter in which the rolling mill had quoted the price of $54 per ton on 2,000 to 5,000 tons of iron rails. The rolling mill refused to book the order; and the railway company sued for damages for breach of contract. The court ruled that, when the railway company, instead of accepting the rolling mill’s offer to sell 2,000 to 5,000 tons of rails, made the counter proposition to buy only 1,200 tons, the railway company thereby rejected the rolling mill’s offer, and that the railway company could not thereafter go back and accept it. In the course of the opinion it was said, referring to the rolling mill’s offer to sell 2,000 to 5,000 tons of rails: “This offer, while it remained open, without having been
 
 *1074
 
 rejected by the plaintiff or revoked by the defendant, would authorize the plaintiff to take, at his election, any number of tons not less than 2,000, nor more than 5,000, on the terms specified.” That is the expression which counsel for the defendant quote and rely upon in this case. What was meant was that the offer of the rolling mills, to sell 2,-000 to 5,000 tons of rails, gave the railway company, the right to close a contract by agreeing to take any number of rails which the railway company might specify, not less than 2,000 nor more than 5,000 tons. The ruling is not appropriate to this ease, because the offer of the rolling mill, in its very nature, gave the railway company the option of making a contract for any specified number of tons of rails, between the minimum and maximum limits stated in the offer of the rolling mill.
 

 Counsel for defendant cite also Staver Carriage Co. v. Park Steel Co. (C. C. A.) 104 F. 200, 202 ; Louisville Soap Co. v. Taylor, Lowenstein & Co. (C. C. A.) 279 F. 470, 472 ; and Taggert v. Brimfield (C. C. A.) 281 F. 830, 831. In the Staver Carriage Company’s Case, the ruling was that, in a contract to furnish all of the tire steel that would be used in the buyer’s carriage works prior to September 1,1899, “not to exceed 14,000 sets, nor to be less than 10,000 sets,” the quantity which the seller was bound to furnish and which the buyer was bound to take was measured by the quantity reasonably required for use in the buyer’s carriage works up to the date specified, within the limits specified, and that the buyer’s petition in the suit for breach of the contract did not set forth a cause of action by alleging merely that the seller had failed to furnish the steel ordered for shipment beyond the 10,000 sets, and up to 14,000 sets, because it was not alleged that the steed not shipped was actually needed for use in the plaintiff’s works prior to September 1, 1899. That ruling is not appropriate here, where there is no limitation in the contract as to the quantity needed by the buyer, and no other limitation except the minimum and maximum quantity specified. In the Louisville Soap Company’s Case, the contract was for Taylor, Lowenstein & Co. to furnish, and for the soap company to buy, “Louisville Soap Company’s requirements [of rosin] from April 1, 1918, to March 31, 1919; 20,000 round barrels minimum, 40,000 round barrels maximum.” The soap company took, within the year specified, 12,989 barrels of rosin, and refused to take more; and 'Taylor, Lowenstein & Co. sued for damages for the failure of the soap works to take 7,011 barrels, the difference between the amount taken and the minimum limit of’ 20,000 barrels. The soap company contended that the quantity called for by the contract was limited to the company’s “requirements from April 1,1918, to March 31,1919,” and that, as the company’s requirements for the year did not exceed the 12,989 barrels of rosin accepted and paid for, the company was not obliged to take more. But the court ruled that the limitation as to the soap company’s requirements for the year merely .gave the soap company the right of electing how many barrels it would take, between the minimum and maximum number stated in the contract, and that the company was bound by the contract to take 20,000 barrels of rosin, and that Taylor, Lowenstein & Co. was bound to furnish as many barrels of rosin as the soap company might order, up to the maximum of 40,-000 barrels. In that case, the stipulation in the contract, as to the buyer’s “requirements,” gave the buyer the right of election as to the quantity to be bought, between the minimum and maximum limits stipulated. There was no stipulation in the contract in the present case, as to the box company’s
 
 *1076
 
 requirement?. There was no intention to furnish the box company all of the timber that it would require for its mill during the term of the contract. When Lee offered to sell his timber to the company, a representative of the company checked the tracts of land on which Lee owned or controlled the standing timber, and concluded that Lee could deliver within the time stipulated more than 1,000,000 feet of timber but not more than 2,000,000 feet, and the company was not willing to buy less than 1,000,000 feet, nor willing to obligate itself to take more than 2,000,000 feet. With that understanding the contract was signed, on a printed form furnished by the company and used by the company generally in buying timber for its mill or factory. The ease therefore may be tested by another rule stated in the decisions which have been cited, viz.: When, from the nature of the contract or the circumstances, the case is one where the buyer intends to secure all that he may need of the commodity, but is unable to say how much he will need, then the margin or leeway between the minimum and maximum quantity stipulated in the contract is for his benefit, and it is his right to .determine afterwards what quantity he will accept, within the minimum and maximum limits stipulated ; but when, from the nature' of the contract or the circumstances, the seller desires to dispose of all that he can supply of the commodity, but does not know exactly how much he can supply, the margin or leeway between the minimum and maximum quantity stipulated in the contract is for his benefit, and it is his right to determine afterwards what quantity he will supply, within the minimum and maximum limits stipulated. Taggert v. Brimfield was a case where the buyer desired to secure all that he might need within the time specified, of the kiud of gravel specified, but did not know exactly how much he would need. The margin or leeway, therefore, between the minimum of 10,000 tons and the maximum of 25,000 tons, as stipulated in the contract, wás for the benefit and protection of the buyer. And so the. court'.said: “Contracts of this general .type are common, where a manufacturer hás to provide in advance for a supply of some needed material, the exact amount of which he éannot then specify. In this uncertainty, he names á minimum, which on his part he positively agrees to take, and he names a niáximuin up to, but not beyond, which the seller is bound to furnish. In this way, both parties are protected. The seller has insured an absolute sale' of a definité, minimum amount, which the buyer is bound to take, no matter whether he needs it or not.
 
 \
 
 So, also, in consideration of such present tninimum sale, which 'the seller then, makes, he. agrees .on his part to furnish a further: quantity up to the maximum, if the buyer, requires it.” ■ This, as we have said, is not such -a case.
 

 Our conclusion is that' the defendant is liable for its breach of the contract, for the value of 50,000 feet of logs at $35 per M feet.
 

 The judgment appealed from is annulled, and it is ordered, adjudged, ánd decreed that the plaintiff, Eugene'T. Lee, rec'over of and from the defendant, National Bo;£ Company, of Natchez,. Miss., $1,750'; with interest thereon at 5 per cent, per annum from judicial demand, March 23,1921," and' the costs of this suit. ■ ■
 

 THOMPSON, J., recused.