The judgment appealed from is affirmed, with all costs.

ST. PAUL, J., absent on account of illness, takes no part.

147 So. 37

## UNITED CARBON CO. v. INTERSTATE NATURAL GAS CO., Inc.

No. 31793.

Jan. 30, 1933.

Rehearing Denied March 27, 1933.

Herold, Cousin & Herold, of Shreveport, and McHenry, Montgomery, Lamkin & Lamkin, of Monroe, for appellant.

Dart & Dart, of New Orleans, Shotwell & Brown, of Monroe, and H. Grady Price, of New Orleans, for appellee.

ODOM, Justice.

Plaintiff prosecutes this appeal from a judgment rejecting its demands for $481,-957.20, alleged to be due under a contract dated October 9, 1926, in which it agreed to sell, and defendant agreed to purchase, natural gas.

The late Judge Sandel, before whom the case was tried in the district court, wrote an opinion in which he accurately (with one slight exception) and concisely stated the issue involved, as well as the contention of counsel for the respective sides. We can state them no better than he did. His statement of the case is as follows:

"This is a suit by the plaintiff, United Carbon Company, against the defendant, Interstate Natural Gas Company, Inc., to obtain payment for natural gas, which was not delivered to defendant, but which plaintiff claims defendant was bound to pay for according to the terms of a contract between the parties. There is no dispute as to the amount of gas which was delivered by the plaintiff to the defendant and paid for by it. There is no doubt that the plaintiff was capable of delivering the maximum quantity of natural gas called for by the contract; and no doubt the plaintiff vigorously complained to the defendant that it was not taking the minimum amount of gas required by the contract, and that the defendant as vigorously contended that it was taking and paying for the minimum amount of gas required by the contract. The decision of this case, there-

fore, depends upon the construction and interpretation of the contract between the parties. This contract, dated October 9, 1926, and the dispute wholly concerns the proper interpretation of paragraph 2 of the contract, which is as follows, to wit:

" '2. Quantity. Seller agrees to deliver hereunder a maximum of forty million (40,-000,000) cubic feet of natural gas per day of twenty-four hours during each and every day of the life of this contract, its obligation to be subject however to the limitations contained in the 11th Article of this agreement. The Buyer agrees to purchase and take not less than thirty million (30,000,000) cubic feet of gas per day of twenty-four hours which minimum may be taken throughout each and every day or by the use of a larger volume during any portion of a month and a less volume during the remaining portion, such variation however not to exceed twenty (20) per cent. above or below the above specified minimum of thirty million (30,000,000) cubic feet per day. The said purchases of gas are made in order to enable the Buyer to fulfill the requirements of the refinery of the Standard Oil Company of Louisiana at Baton Rouge and the requirements of the plant supplying artificial gas to the City of Baton Rouge should such plant be converted into a natural gas system, all of which requirements are estimated to be or shortly become seventy million (70,000,000) cubic feet per day. It is agreed that in the case of any shortage below seventy million (70,000,000) cubic feet per day in the rate of such sales to said refinery and to Baton Rouge, the rate of flow and volume of deliveries hereunder in said minimum amount of thirty million (30,000,-000) cubic feet per day by the Seller to the Buyer are to be decreased pro rata, but the full rate of flow and volume of deliveries to make said minimum of thirty million (30,-000,000) cubic feet per day shall be renewed promptly when the rate of such sales to said refinery and to Baton Rouge are restored.'

"Plaintiff contends that under these provisions of the contract, the defendant is compelled to pay for a minimum of thirty million (30,000,000) cubic feet of gas per day under any circumstances, whether or not it received and used such amount for the purposes stated in the contract and regardless of the sales to the refinery of the Standard Oil Company and to Baton Rouge; and the defendant contends that the minimum of thirty million (30,000,000) cubic feet of gas per day is not a fixed minimum for which it is bound to pay, but that the minimum provided for in the contract is a changing and fluctuating minimum based on the sales of gas to the refinery of the Standard Oil Company and to Baton Rouge, as provided in the contract, and that it has taken and paid for more gas than is called for by the minimum requirements of the contract. The question, therefore, to be decided, is: What is the minimum amount of gas the defendant is bound to pay for under the provisions of the contract."

1. It will be noted that in the pertinent portion of the contract copied in the opinion of the trial judge, the plaintiff agreed to deliver to defendant a maximum of 40,000,000 cubic feet of natural gas per day and that defendant "agrees to purchase and take not less than thirty million (30,000,000) cubic feet of gas per day."

It is not denied that plaintiff was and is bound absolutely to deliver to defendant the maximum amount of gas per day stipulated in the contract. But defendant argues that it is not bound to take the minimum quantity stipulated. Its contention is that the last clause of the quoted portion of the instrument supersedes that portion which provides for the minimum amount which it was to take.

After providing for the maximum to be delivered by plaintiff and the minimum to be taken by defendant, and after setting out the purpose of defendant in entering into the contract, it is provided:

"It is agreed that in case of any shortage below seventy million (70,000,000) cubic feet per day in the rate of such sales to said refinery and to Baton Rouge, the rate of flow and volume of deliveries hereunder in said minimum amount of thirty million (30,000,-000) cubic feet per day by the Seller to the Buyer, are to be decreased pro rata, but the rate of flow and volume of deliveries to make said minimum of thirty million (30,000,000) cubic feet per day shall be renewed promptly when the rate of such sales to said refinery and to Baton Rouge are restored."

The district judge held that the purpose and effect of this part of the contract was to establish a "fluctuating minimum of gas to be taken by the defendant, based on the rate of sales of gas to the refinery of the Standard Oil Company and to Baton Rouge, the express purpose for which the gas was purchased."

If the parties to this contract intended to provide for and establish a "fluctuating minimum" of gas to be taken each day by the

defendant, then that part of the instrument which says that defendant "agrees to purchase and take not less than thirty million (30,000,000) cubic feet of gas per day" means nothing at all and may as well have been left out. Surely that part of the contract means something, and if it means anything, it means what it says. The parties who made and entered into this contract are experienced and astute business men, and we concur fully with the statement of the district judge to the effect that the contract itself and all the surrounding circumstances show that the parties were considering every detail and that in the confection of it they took into consideration "the purpose for which the gas was purchased, the estimated amount which would be required for such purposes, the maximum amount to be delivered by plaintiff, the minimum amount to be taken by defendant, that the amount required for the purposes stated in the contract would change and fluctuate," etc.

It is inconceivable to us that business men like these would in one paragraph write something into the contract and in the next write it out. Yet that is exactly what they did, if the trial judge correctly interpreted the contract. We think each of these paragraphs means something and to us the meaning is not hard to find.

2. One paragraph of the preamble to the contract here involved reads as follows:

"Whereas the buyer (the defendant here) is constructing a pipeline from the Monroe gas field (this is where plaintiff's properties and wells are located) to the city of Baton Rouge for the delivery of natural gas for the fuel requirements of the refinery of the

Standard Oil Company and desires to supplement its supplies of natural gas from the seller."

In the body of the contract it is stated that, "The said purchases of gas are made in order to enable the buyer to fulfill the requirements of the refinery of the Standard Oil Company of Louisiana at Baton Rouge and the requirements of the plant supplying artificial gas to the city of Baton Rouge should such plant be converted into a natural gas system (it has since been so converted), all of which requirements are estimated to be or shortly become seventy million (70,000,-000) cubic feet per day."

These stipulations clearly show that the parties contemplated that the Standard Oil Company at Baton Rouge was using or would use "natural gas for (its) fuel requirements," which "requirements," and those of the plant supplying artificial gas to the city of Baton Rouge, should such plant be converted into a natural gas system (and it was), would furnish a market for the gas purchased by defendant.

It is alleged by plaintiff in paragraphs 7 and 8 of its petition, and it offered to prove on the trial of the case, that throughout these negotiations, it was represented to plaintiff by defendant that the refinery at Baton Rouge would use gas exclusively for its fuel and that the fuel requirements of that concern and the gas plant in the city of Baton Rouge would amount to an average of 70,-000,000 cubic feet per day, and further that defendant stated that its representations were based on "careful and complete survey by its engineers that the natural gas fuel requirements of the Standard Oil Company

and the city of Baton Rouge were or would shortly become 70,000,000 cubic feet per day."

This contract and another entered into on the same day to which plaintiff, defendant, and others were parties, show that defendant in its purchase of gas, at least in some instances, was represented by its engineers, Ford, Bacon & Davis. From this it may be inferred that defendant was not in the dark as to the full requirements of the concerns for which gas was purchased.

When the contract was entered into, the defendant was constructing a pipe line from the Monroe gas field to Baton Rouge through which to convey the gas to that market. Its then prospective customers were the refinery of the Standard Oil Company and the city of Baton Rouge. Plaintiff was aware of this, for it was so stated in the contract. It was estimated by the parties that these fuel requirements would be 70,000,000 cubic feet for each day of twenty-four hours. Whether defendant represented to plaintiff that the refinery would use only natural gas for fuel and that its requirements and that of Baton Rouge would amount to 70,000,000 feet per day or not, it is not reasonable to assume that plaintiff would have obligated itself to incur the enormous expense of producing and holding itself ready at all times for fifteen years to supply defendant with 40,000,000 feet of gas per day if it had not contemplated that the requirements of these concerns would justify the expense of the venture. Unless these requirements were as estimated and contemplated, defendant would not have sufficient market to justify the venture and therefore could not buy.

The requirements of these concerns was

unquestionably within the contemplation of each of the parties. They based the estimate of the amount which might have to be furnished by plaintiff, and the amount which defendant would take, upon these requirements. That was the only basis they had for fixing these amounts.

Plaintiff alleged (paragraph 16 of the petition):

"That at all times since the first day of January, 1927, the fuel requirements of the Standard Oil Company of Louisiana and of the gas plant of the city of Baton Rouge have averaged 70,000,000 cubic feet of natural gas per day."

At the trial of the case, plaintiff offered to prove by a skilled gas engineer that the fuel requirements of the Standard Oil Company and Baton Rouge were at all times during the years this contract has run in excess of 70,000,000 feet per day. It also attempted to prove that the representations alleged to have been made by defendant that the daily requirements of these customers would be 70,000,000 cubic feet per day was based upon a report of its engineers, Ford, Bacon & Davis. The testimony was objected to as irrelevant and the objection was sustained.

3. Counsel for defendant in their brief say that under the contract defendant "is bound to take three-sevenths of the amount of its sales to Standard Oil of Louisiana refinery and Baton Rouge electric. The fraction three-sevenths is arrived at by maintaining the ratio of 30 to 70 as provided in the quantity clause of the contract."

If that be true, then the contract is utterly void for want of mutuality. If both parties are not bound, neither is bound. If the defendant was bound to take from plaintiff only so much gas as it might sell, it was not bound to take any quantity at all. It did not bind itself to sell to the named prospective consumers, or to any one else, any specific quantity of gas or any gas. If it was bound to take only such amount as it might sell, it was within its power to regulate absolutely the quantity to be taken, for it might choose to sell 10,000,000 cubic feet per day or none at all. In other words, according to defendant's contention, it is left entirely to it to determine, as its interest or caprice might suggest, whether to take any gas from plaintiff. If the contract places defendant under no obligation to take any gas from plaintiff, while at the same time plaintiff is bound to deliver whatever quantity defendant may demand, then it is a nudum pactum and falls dead. An agreement to sell with no corresponding agreement to buy is without consideration and void. Where one party is at liberty to perform or not as it sees fit, it is not bound and neither is the other. Where one party to a contract only is bound it is a nudum pactum. Campbell v. Lambert, 36 La. Ann. 35, 51 Am. Rep. 1; Landeche v. Sarpy, 37 La. Ann. 836; Martel v. Jennings-Heywood, 114 La. 351, 38 So. 253; Blackshear v. Hood, 120 La. 966, 45 So. 957; Sherer-Gillet Co. v. Bennett, 153 La. 304, 95 So. 777; Caddo Oil & Mining Co. v. Producers' Oil Co., 134 La. 711, 64 So. 684; Nelson v. Barber, 143 La. 783, 79 So. 403, 405; Kennon v. Brooks-Scanlon, 148 La. 120, 86 So. 675; Heeb v. Codifer & Bonnabel, 162 La. 139, 110 So. 178; Blanchard v. Haber, 166 La. 1014, 118 So. 117.

4. Counsel for defendant say in one of their briefs that what the contract means

is this: "If defendant sells 70 million cubic feet or more of gas per day to the refinery and gas plant, it is obliged to take from plaintiff a minimum of 30 million cubic feet; but if it sells less than 70 million cubic feet per day to those consumers, then it is only obliged to take from plaintiff three-sevenths of the amount of such sales."

We cannot sanction that interpretation of the instrument, for to do so would be to hold that it is void. A contract cannot stand if its enforcement rests solely upon the will of one of the parties. As we have said, defendant might choose or will to sell any amount of gas it saw fit or none at all. It is argued that it may be assumed that defendant would sell all the gas it could. That is beside the question. The pertinent point is, not what it might or would do, but what it is bound to do.

To paraphrase counsel's statement, we think what the contract means is this:

If the full requirements of the refinery and the city of Baton Rouge amount to 70,000,000 cubic feet or more of gas per day, the defendant is obliged to take from plaintiff a minimum of 30,000,000 cubic feet per day; but if such requirements are less than 70,000,000 cubic feet per day, then it is only obliged to take from plaintiff three-sevenths of the amount of such requirements. The word "requirements," as used in the contract, means that which is necessary, needed, or essential for fuel, and not that which might be demanded or requested.

These parties had a sound basis on which to base their estimates. The gas was to be used for the fuel purposes of an established business. Each party knew the needs, the essentials of the prospective customers. They had in view the amount of gas needed for the fuel purposes for the established concerns named. The minimum amount of gas which defendant agreed to take was based upon certain needs which it knew then existed. Andrews Coal Co. v. School Board, 151 La. 695, 92 So. 303; Nelson v. Barber, 143 La. 783, 79 So. 403; Lee v. National Box Co., 170 La. 1065, 129 So. 638; and the authorities therein cited, especially Louisville Soap Co. v. Taylor (C. C. A.) 279 F. 470, and Taggert v. Brimfield (C. C. A.) 281 F. 830.

5. The maximum and minimum limits stipulated in this contract cannot reasonably be read out of it. Each of the parties is protected by the limits expressed. Plaintiff is not required to deliver any quantity of gas beyond 40,000,000 cubic feet per day. Defendant is not bound to take any quantity in excess of 30,000,000 feet. The "fluctuating" amount which defendant may take and which plaintiff must deliver is between thirty and forty million feet. It is optional with defendant whether it take any quantity in excess of 30,000,000 feet up to 40,000,000 feet. Its only leeway is between those figures.

6. In construing contracts, courts should, if possible, ascertain the true intent of the parties. Contracts must be construed as a whole. "All clauses of agreements are interpreted the one by the other giving to each the sense that results from the entire act." Civ. Code, art. 1955. In construing contracts, "the court will if possible give effect to all parts of the instrument and a construction

which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable; and if this is impossible a construction which gives effect to the main apparent purpose of the contract will be favored." Williston on Contracts, § 619; 13 Corpus Juris, 525.

"Where the language of an agreement is susceptible of two meanings, it must be interpreted in the sense most congruous to the whole contract." Ross v. Garlick, 10 Rob. 365.

7. To construe this contract as defendant says it should be, would destroy it. But it is not contended that it is void. On the contrary, counsel vouch for its validity. The contract should be construed as a whole. The two quantity clauses should be construed together. We do not think they are conflicting. The latter clause beginning with the words, "it is agreed that in case of any shortage," means that if the fuel requirements or needs of the Standard Oil Company and the city of Baton Rouge should, due to accidental or unforeseen conditions, drop below 70,000,000 feet per day, then defendant would not be required to take as much as 30,000,000 feet per day, but "decreased pro rata"; and that "the rate of flow and volume of deliveries to make said minimum of thirty million (30,000,000) cubic feet per day shall be renewed promptly" when the requirements or needs of the refinery and Baton Rouge are "restored."

The contract reads that the minimum cubic feet per day "shall be *renewed* promptly when the rate of such *sales* to said refinery and Baton Rouge are *restored*." If this means that the minimum is to be renewed only when *sales* are *restored*, then another potestative condition is involved, because the question when or whether the sales were restored would depend on whether defendant wanted them restored. This would make "the execution of the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder." Civ. Code, art. 2024.

Surely, the parties did not mean that. The contract contemplated the expenditure of enormous sums by each of the parties. It was to continue for fifteen years. It was intended to have effect. It was not intended that either should have power to destroy it. Our construction harmonizes the two quantity clauses and saves the contract.

8. Plaintiff alleged that a majority of the stock of the Interstate Natural Gas Company, the defendant, is owned by the Standard Oil Company of New Jersey, and that all of the stock of the Standard Oil Company of Louisiana is owned by the Standard Oil Company of New Jersey, and that Mr. Christey Payne is vice president and chief executive officer of the defendant company and is directing head of the natural gas department of the Standard Oil Company of New Jersey and all its subsidiaries. It offered to prove this and further offered to prove that at the time this contract was entered into a large percentage of the natural gas needed by the refinery of the Standard Oil Company was used for the purpose of generating steam for its refinery and that the Standard Oil Company no longer generates the steam it requires, but is supplied with

steam generated by the Louisiana Steam Products Company, an affiliated and subsidiary corporation, and that this defendant supplies and sells gas to the latter company. Further effort was made to show the interrelationship and common control of all these companies, and to show that gas originally intended to be used by the Standard Oil Company to generate steam had been intentionally diverted to the Louisiana Steam Products Company to be used for the same purpose, and that defendant does not take into consideration the gas sold to the Louisiana Steam Products Company in making its returns of the amount of gas sold.

Plaintiff also attempted to prove that the estimate of 70,000,000 cubic feet of gas set out in the contract was a representation made by defendant based upon a report made by its engineers, Ford, Bacon & Davis, and offered to prove by competent gas engineers that the fuel requirements of the Standard Oil Company and Baton Rouge were at all times during the period of the contract in excess of 70,000,000 feet of gas per day.

This testimony was all ruled out on the ground of irrelevancy. Under our interpretation of the agreement it was all relevant and should have been admitted.

For the reasons assigned, the judgment appealed from is set aside, and it is ordered that the case be remanded for retrial in accordance with the views herein expressed; costs of this appeal to be paid by the appellee, all other costs to await final results.

ST. PAUL, J., absent on account of illness, takes no part.