ODOM, Justice.
 

 As stated by counsel for plaintiff in their brief at page 5, this is a suit by Theodore H. Martin against Dutton Motors, Inc., “for damages caused by the failure of defendant to deliver ten new Ford trucks in accordance with a contract entered into between plaintiff and defendant on April 8, 1941”.
 

 Plaintiff alleged that on April 8, 1941, he delivered to defendant seven used Ford dump trucks, which said trucks were received and have since been held by the defendant “as a deposit on new Ford dump trucks which were
 
 thereafter, to be purchased by petitioner at his convenience for future delivery, with the understanding that in the event petitioner purchased as many
 
 
 *157
 

 as ten new Ford dump trucks
 
 the amount of said deposit, represented by the seven used trucks, was to be treated as a credit upon the new purchase in the sum of $3,000,
 
 and with the further distinct understanding that should petitioner purchase less than ten new trucks
 
 the amount of the credit was to be determined by allowing only $300.00 on each of the new units purchased”. (Italics here and elsewhere are ours.)
 

 Paragraph 3 of plaintiff’s petition reads in full as follows:
 

 “That this agreement, insofar as said defendant was concerned, is represented by a receipt dated April 8th, 1941, signed by Frank B. Lower, Sales Manager of said defendant, acting upon due authority, and which said receipt is attached hereto and made a part of the present petition as if written herein.”
 

 The instrument alleged upon, which is referred to variously as a “receipt”, a “contract”, and a “document”, which plaintiff attached to, and made part of, his petition, reads in full as follows:
 

 “Dutton Motors, Inc.
 

 “Ford “Mercury “Lincoln Zephyr “Baton Rouge, Louisiana
 

 “April 8, 1941
 

 “Received of Mr. T. H. Martin, St. Fran-' cisville, Louisiana
 
 7
 
 Used Dump Trucks as deposit on New Ford Dump Trucks to be purchased by Mr. Martin at his convenience in the future. In the event that as many as 10 New Ford Dump Trucks be purchased, the amount of the deposit for the
 
 7
 
 Used. Units will be $3,000.00. In the event that Mr. Martin should purchase less than 10 New units, the amount to be based on $300.-00 allowance per New unit.
 

 “(Signed) Frank B. Lower' “Sales Manager
 

 “Flower/lmd”
 

 In Paragraph 4 of his petition, plaintiff alleged that, at the time this receipt was signed, he was engaged in the business of a contractor, which included the hiring of trucks to others for the purposes of hauling operations’ generally, “and that the very purpose of said agreement with defendant was to insure the availability of ten additional new trucks which petitioner anticipated would be required in connection with his said operations, and all of which was within the direct knowledge of the said defendant at the time of said agreement”.
 

 He alleged that on August 1, 1941, in line with his general operations he sub-’ mitted a bid to the Forcum-James Company of Shreveport, Louisiana, offering to supply 10 new Ford dump trucks, valued at $1,512.60 each, at' a monthly rental of-$250 for a period of three months, and that said agreement of April 8, 1941^ was made with the distinct understanding that said trucks would be sold by defendant upon the basis of existing market value - of said trucks at the time delivery was requested by petitioner, and that, prior to the submission .of- said bid to Forcum-James Company, he communicated with the defendant by telephone and was advised by its authorized agent and employee, Mr.- Brown, that the unit price of said trucks would be
 
 *159
 
 $1,512.60, and that this figure was thereafter submitted in petitioner’s bid.
 

 He alleged that his bid proved to be the lowest and was accepted, and that he “on or about August 11, 1941, telephoned defendant from St. Francisville, Louisiana, and through its manager and authorized agent, Mr. J. Theron Brown
 
 requested immediate delivery of said ten new Ford dump trucks".
 

 He alleged that, when he notified defendant to make delivery, which, according to his allegations in Paragraph 7, was on August 11; 1941, the defendant, through its manager, Mr. Brown, “suggested that delivery could not be made for two weeks, and that even then it might not be possible to obtain the dump trucks to which the said agreement referred; Mr. Brown further said that within the two weeks period defendant might be able to deliver certain trucks in lieu of said dump trucks which he referred to as ‘cab over engine type trucks’ having 158" wheel base”.
 

 He further alleged that defendant failed to make delivery of said trucks, and that on August 30, 1941, Forcum-James Company advised him that, due to his inability to furnish the trucks, his contract with Forcum-James Company was cancelled; that, under the agreement which he had with Forcum-James Company, he was to be paid the sum of $250 per month as a rental for each of the 10 trucks; that the contract would have lasted for a period of five months, and therefore he had lost $12,500 through the failure of defendant to fulfill its obligation to deliver the 10 trucks. He claimed damages in this amount, plus $3,000, the alleged value of the used trucks deposited by him with defendant on April 8, 1941.
 

 In Paragraph 16 plaintiff alleged that:
 

 “In further support of said damages petitioner shows and alleges on information and belief that the said ten dump trucks were not available in any market within the reach of petitioner so as to make it possible for him to consummate a deal for the purchase of the same in time to prevent the loss of said contract.”
 

 He prayed for judgment against the defendant for $15,500.
 

 Defendant admitted in its answer that F. B. Lower, its sales manager, had authority to sign the instrument of April 8, 1941, quoted above, but it alleged that the instrument itself shows on its face that it is not a contract, because the three essentials of a contract are lacking — that is, the thing, the price, and the consent; that according to the instrument plaintiff did not obligate himself to purchase from defendant 10 trucks or any number of trucks, nor did defendant obligate itself to sell and deliver to plaintiff 10 new dump trucks or any trucks at all, and, further, that the instrument shows on its face that no price was agreed upon.
 

 Defendant admitted that, at the time this, instrument was signed on April 8, 1941, 'it was contemplated that plaintiff would in the near future purchase from it new dump, trucks, possibly as many as 10, but that at that time plaintiff was not sure he would want to purchase 10 trucks or any trucks,
 
 *161
 
 because whether he purchased the trucks or not depended upon whether he could secure a contract which would enable him to use them, and for that reason plaintiff did not at that time obligate himself to purchase from defendant, nor did defendant obligate itself to sell to plaintiff, 10 trucks or any trucks. Hence there was no contract entered into at that time.
 

 Defendant admitted that it intended to supply said trucks if and when ordered, but it alleged that it was under no obligation to keep constantly on hand a supply of trucks to be delivered immediately upon demand, for the reasons that plaintiff had not obligated himself to purchase the trucks, and that plaintiff did not at that time, or at any time later, furnish defendant with specifications as to the type, kind, length, and size of the trucks which he might want. Defendant specifically alleged that, shortly after the receipt was signed on April 8, 1941, it became apparent that due to the emergency brought about by war conditions there would be a shortage of trucks, which was a matter of common knowledge, and that therefore on numerous occasions between that date and August 11, when it was called upon by plaintiff to furnish the trucks, it had advised plaintiff of such impending shortage and urged him to furnish defendant the details of number, size, kind, and length of. trucks he might wish to purchase, so as to avoid undue delay of delivery when and if the trucks were ordered, but that plaintiff refused to furnish such information.
 

 Defendant alleged that, when plaintiff finally ordered the trucks, he demanded immediate delivery of them; that it was impossible to make immediate delivery for the reason that defendant did not have the trucks on hand and could not be expected to have them on hand since plaintiff had not furnished the necessary specifications and had not informed it as to the number of trucks he would demand, and that the trucks could not then be readily obtained; and that in the month of July it had on hand eight Ford trucks which might have been equipped as dump trucks for use by plaintiff; that it had received an offer for the purchase of these trucks from another party; that, before selling them, it had communicated with plaintiff on two occasions by telephone and had given him the refusal of the trucks, and that plaintiff had refused to purchase them.
 

 Defendant specifically alleged that plaintiff’s failure to furnish detailed information and specifications when he was called upon to do so by it was the sole cause of its inability to supply the trucks when 'demanded; that its failure to supply the trucks was due to no fault of its own.
 

 It admitted that it had received seven used dump trucks from plaintiff, as alleged by plaintiff in Paragraph 2 of his petition, “as a deposit
 
 on new Ford, dump trucks zuhich were thereafter, to he purchased by petitioner at his convenience for future delivery
 
 ”. Defendant alleged that, according to custom in such cases, it sold the used trucks in good faith and received for them the sum of $1,135, which was all they were worth on the market, and that its only obligation toward plaintiff was to pay to him the amount which it had received, less cer
 
 *163
 
 tain commissions which it had paid for selling the trucks. This amount was tendered to plaintiff by defendant in,open court, which tender was refused.
 

 There was judgment in the district court rejecting plaintiff’s demands for damages, and in his favor for the sum of $1,135, the gross amount received by defendant from' the sale of the seven used trucks, with interest; the court rejecting defendant’s plea that it should be allowed as a credit $67.75 paid as commissions for the sale of the trucks. Defendant was ordered to pay all costs of the suit. From this judgment the plaintiff appealed.
 

 Counsel for the respective sides have discussed at considerable length, both in their briefs and in oral argument before this court, the question whether the instrument signed on April 8, 1941, evidences a contract binding plaintiff to purchase from defendant, and binding defendant to sell and deliver to plaintiff, 10 new Ford dump trucks. Plaintiff alleged that the contract between him and the defendant was evidenced by that instrument.
 

 But plaintiff’s petition, construed as a whole, and his own testimony show beyond question that no contract of sale of 10 new Ford dump trucks was consummated on that date. In Paragraph 2 of his petition he alleged that on April 8, 1941, he delivered to defendant seven used Ford dump trucks as a deposit on new Ford dump trucks “which were thereafter, to be purchased by petitioner at his convenience for future delivery, with the understanding that in the event petitioner purchased as many as ten new Ford Dump trucks” the amount of said deposit, represented by the seven used trucks, was
 
 to he
 
 treated as a credit of $3,000 upon a new purchase, “and with a further distinct understanding
 
 that should petitioner purchase less than ten new trucks
 
 the amount of the credit was to be determined by allowing • only $300 on each of the new units purchased”.
 

 Furthermore, plaintiff’s allegations show that neither the number of new trucks “to be purchased by petitioner at his convenience” nor the price thereof, if purchased, was agreed upon at that time. Plaintiff alleged that by the agreement of April 8, 1941, it was distinctly understood that “said trucks
 
 would he sold
 
 by the defendant upon the basis of the existing market value for said trucks at the time delivery was requested by petitioner”.
 

 It clearly appears, therefore, that, according to plaintiff’s own theory, there was no contract entered into between plaintiff and defendant for the. sale and purchase of trucks on April 8, 1941.
 

 Article 2439 of the Revised Civil Code reads as follows: •
 

 “The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
 

 “Three circumstances concur to the perfection of the contract, to-wit: the thing sold, the price and the consent.”
 

 Article 2464 of the Code provides that “The price of the sale must be certain, that is to say, fixed and determined by the parties.”
 

 
 *165
 
 “A contract is an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something, expressed or implied by such agreement.” Revised Civil Code, Article 1761.
 

 “Every obligation is null, that has been contracted, on a potestative condition, on the part of him who binds himself.” Revised Civil Code, Article 2034.
 

 “The potestative condition is that which makes the execution of the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder.” Revised Civil Code, Article 2024.
 

 If, as contended by plaintiff, the instrument dated April 8, 1941, evidences a contract, then the obligation is null and void because it was contracted on a potestative condition. Clearly plaintiff had the power to defeat the execution of the agreement. The execution of the agreement depended upon his own will or caprice. If he had decided for any reason to quit the contracting business, or decided that he would not make bids for contracts which would enable him to use Ford dump trucks, he could have so informed the defendant and thereby put an end to such agreement as he had had with it. The instrument did not bind him to purchase 10 new Ford dump trucks from defendant, nor did it bind defendant to sell him such trucks. Neither party was bound under the terms of that instrument to do anything, and therefore the instrument was a nudum pactum. There was no contract.
 

 In the case of United Carbon Co. v. Interstate Natural Gas Co., Inc., 176 La. 929, at page 940, 147 So. 37, at page 40, we said:
 

 “Where one party is at liberty to perform or not as it sees fit, it is not bound and neither is the other. Where one party to a contract only is bound it is a nudum pactum.” (Citing a long list of cases, including Nelson v. Barber, 143 La. 783, 79 So. 403, in which the ruling is especially applicable to the point here involved.)
 

 But counsel for plaintiff say in their brief that it is their contention in the first place that the language of the “receipt” is sufficient to show a binding contract between the parties. “Of course,” they say, “it is to be interpreted in the light of surrounding facts and circumstances existing at the time it was executed, and its present legal significance is to be determined by what happened thereafter. Contracts unilateral in character or subject to a potestative condition such as is suggested exists here may ripen into a binding agreement between the parties by what transpires thereafter.”
 

 Even if it be conceded that the instrument dated April 8, 1941, was intended to be a contract, it cannot be seriously argued, we think, that the obligation was valid, since it clearly appears that it was “contracted on a potestative condition”.
 

 Counsel's main contention is that, even though it be conceded that there was no contract between the parties originally, the agreement, such as it was, ripened into a contract upon the happening of events
 
 *167
 
 which transpired thereafter. The record shows that on or about August 11, or four months after the receipt was executed, plaintiff offered to purchase from defendant 10 Ford dump trucks, and the theory which he advances seems to be that, even if it be true that the instrument was defective because it does not show that he was bound to purchase the trucks, the defect or infirmity which afflicted the instrument was cured by his offer to purchase. Even so, it does not necessarily follow that defendant also became bound.
 

 If plaintiff alone became bound by his offer to perform, there still was no contract of sale. “No contract is complete without the consent of both parties.” Revised Civil Code, Article
 
 1766.
 
 If defendant ever became bound to deliver 10 new trucks, it was at the time or after plaintiff offered to buy them. It was not bound before. If defendant unconditionally accepted plaintiff’s offer to purchase, which offer was not made until August 11, 1941, four months after the receipt was signed, it became bound to perform. But it never unconditionally accepted plaintiff’s offer 'to purchase.
 

 Plaintiff’s suit for damages is grounded upon the theory that defendant breached its obligation to deliver the trucks. In order to determine whether the defendant has made itself liable to plaintiff for the payment of damages, we must consider all the facts, circumstances, and conditions connected with the case, .and especially the conduct of the parties from the inception of the negotiations to the time they were closed.
 

 Plaintiff alleged that, at the time the receipt was signed on April 8, 1941, he was “in the business of a contractor, which included the hiring [to others] of trucks for the purpose of hauling operations generally and that the very purpose of said agreement with defendant was to insure the availability of ten additional new trucks which petitioner anticipated would be required in connection with his said operations”. His counsel say in their brief at page 6: “The evidence is that Mr. Martin explained to Mr. Lower and other agents and officers of defendant that he would not need the new trucks until he had obtained a contract to do certain work which would require the use of said trucks.” And on page 12 of their brief they say: “There is no dispute but that when the deal was first negotiated it was understood between all parties that the new trucks were not to be delivered until plaintiff got the contract under which he expected these trucks to be put to use.” Plaintiff said in the course of his examination as a witness: “I wanted to have a contract before I would take the trucks out.”
 

 It is evident, therefore, that plaintiff did not intend to purchase the trucks unless he got a contract which would enable him to put them to use, and there was no certainty, of course, that he would ever get a contract. He did not know at that time how many trucks he would buy or whether he would buy any at all. He testified that he had bid on a number of contracts after the receipt was signed but that none of his bids had been accepted. He alleged that on or about August 1, 1941, “in line with his
 
 *169
 
 general operations” he submitted a bid to the Forcum-James Company of Shreveport, Louisiana, “whereunder he offered to supply ten new Ford dump trucks valued at $1,512.60 each at a monthly rental of $250 for a period of three months to be used by the said Forcum-James Company in the construction of an air base for the United States Government at Shreveport, Louisiana”. He alleged and testified that his bid was the lowest, and that it was finally accepted on or about August 11, 1941. So he did not know that he would want to purchase the trucks until August 11, and this accounts for his -conduct toward the defendant, with reference to the purchasing of the trucks, between April 8 and August 11.
 

 The testimony of defendant’s witnesses shows conclusively that on numer'ous occasions between those dates the defendant, through its agents and representatives, called upon plaintiff to say whether or not he would want the trucks and, if so, to submit specifications as to the number, type, and kind of trucks he would want; that defendant’s representatives explained to plaintiff that it was necessary for defendant to have this information in order that it might be in position to deliver the trucks when called upon to do so. These witnesses testified that the only response plaintiff made to these requests was that he did not have any specifications as to what he would need and was not ready to purchase. Defendant’s witnesses testified that they explained to the plaintiff that the reason it was necessary to get this information was that the government had bought and was still buying many trucks; that, due to war and other conditions then prevailing, trucks and truck equipment had become very scarce and were exceedingly hard to get, and that it was anticipated that this shortage would become more acute later on, and that, in order that defendant might be able to deliver the trucks when ordered, if ordered at all, it should have advance information as to the number, kind, and type of trucks plaintiff might purchase. These witnesses explained to Mr. Martin that they did not keep a great many trucks on hand, and that, if and when he placed his order, it might be necessary for defendant to order the trucks from the factory or from othef agencies. Plaintiff did not dispute this testimony of defendant’s witnesses.
 

 Defendant’s witnesses testified that, a few days prior to the date on which plaintiff submitted his bid to Forcum-James, defendant had on hand eight Ford dump trucks with 134-inch wheel-base, and that one of defendant’s representatives informed plaintiff of this fact, telling him that defendant then had an offer from another party to purchase these trucks, but that, if plaintiff wanted them, defendant would hold them for him. Plaintiff’s response was. that he was not ready to accept them. Plaintiff as a witness did not deny this.
 

 The reason, of course, that plaintiff did not supply the specifications and did not accept defendant’s offer to hold the eight trucks for him was that he did not know whether he would want to purchase 10 trucks, or any other trucks, or just what kind of trucks he would want, if he wanted
 
 *171
 
 any. He could not supply this information because he had no contract, and, if he'got one, he would have to purchase such trucks as the other party demanded.
 

 Referring now to the offer to purchase the trucks, which, as we have stated, was made on August 11,'1941, the record discloses that the offer to purchase was coupled with the demand that the trucks be delivered immediately. Mr. Brown, who received the order, gave the following testimony relative to the aforesaid conversation :
 

 “Yes, he telephoned me and said that he might need these dump trucks that he had on order and wanted to know if we had them in stock and I told him that we didn’t have them all in stock at the time and he said, ‘Well, I may need those trucks right away’, and he said, T have a contract with you to deliver those trucks to me at my convenience and it is convenient now for me to take delivery and I want them right away’.”
 

 Mr. Brown was asked what he said in reply to plaintiff’s demand. He said his response was:
 

 “ Well, Mr. Martin, we can’t deliver you the trucks momentarily. I will have to phone the Ford- Motor Company and scout around and see if we can get them’. And he said, ‘No, I want them right now. I either want my trucks or I want my money. I want to know what you are going to do about it’.”
 

 At the expense of brevity, we quote the following extract from Mr. Martin’s testimony as to his version of that telephone conversation:
 

 “I called Mr. Brown up, thinking I had good news for him as anyone would think because I had a good order, and I said, ‘Mr. Brown, I have some good news for you this morning,’ and he said, What is that, Sheriff?’, and I said, T am ready for the ten trucks, I got the contract from Forcum-James.’ He said, Well, I am sorry, sheriff, it looks like we will have a little trouble getting those trucks.’ I said, ‘Don’t kid me. I’m serious about this thing.’ This is the exact conversation we had, and he said, T am not kidding. I don’t think we can get those trucks,’ and I said, ‘Mr. Brown, what_ are we going to do about it?’ and he said, T don’t know, Mr. Martin, I will do my best to try to get them’, so we talked on and I said, ‘Mr. Brown, the only thing I can say if you can’t make a delivery of the trucks I want my $3,000.00 deposit’, and he said, We can’t do that, your equipment wasn’t worth $3,000.00 unless we sell you ten trucks’, and I said, T am ready, Mr. Brown, to buy the ten trucks.’ I said, T either want my money or my trucks,’ and he said, T have sold the trucks.’ I said, ‘Well, it looks like we are going to have to do something about it because I have to get my trucks or my money because I have an opportunity to buy another type of truck to hold my contract.’ I told him I had lost quite a bit of money on a.levee job last year and that this was the first time I would have a chance to get a contract to catch back some of my losses, and we talked along and Mr. Brown for some reason got offended
 
 *173
 
 and said, T don’t have to take that type of talk from you.’ He said, T understand you are kind of tough,’ and I said, ‘No sir, I am not after trouble, all I want is my trucks or my money,’ so he said, ‘You can take that up with Mr. Miller and Mr. Sanders [defendant’s lawyers],’ and I said, ‘To hell with Mr. Sanders, I will take it up with my own lawyer,’ and I hung up.”
 

 It is thus seen that plaintiff demanded immediate delivery of the trucks, and that his offer to purchase was coupled with that demand, although he had been repeatedly told that defendant, in order to make quick delivery of the trucks, would have to have advance information as to the number, and specifications as to the kind of truck to be supplied so that it could get them. Furthermore, this testimony shows that Mr. Brown did not unconditionally accept plaintiff’s offer to purchase. He explained to plaintiff that his company did not have ■ the trucks on hand, nor could it get them immediately. Mr. Brown did not promise unconditionally to get the trucks. He told Mr. Martin that he would get them if he could, and that he would do his best to get them. The testimony shows that in a later telephone conversation plaintiff agreed that defendant might have two weeks further time in which to get the trucks. Mr. Brown did not agree to get them within that time, but did agree to do what he could to get them, and the testimony shows that he was not able to get them. Plaintiff’s pleadings show that the trucks were not available at that time. He alleged:
 

 “In further support of said damages petitioner shows and alleges on information and belief that the said ten dump trucks were not available in any market within the reach of petitioner so as to make it possible for him to consummate a deal for the purchase of the same in time to prevent the loss of said contract.”
 

 While defendant anticipated that plaintiff might want to purchase trucks, it could not reasonably be expected to keep them on hand ready for immediate delivery in case plaintiff called for them, the reason being that it did not know and could not know whether plaintiff would order the trucks, and furthermore it did not know and could not know what kind of trucks plaintiff would want if he should want any. The testimony shows that there are many types of 134-inch wheel-base dump trucks, such as six-cylinder, 85-horsepower and 95-horsepower motors; low speed, medium speed, high speed; single and double ratio axle, and countless combinations of wheels and tires; with or without cab or with cab over engine, etc. Defendant was engaged in the business of selling trucks and other motor vehicles, and it was to its interest to make as many sales as it could. It wanted to make the sale here and could not.
 

 Plaintiff testified that on or about July 30 he telephoned defendant to get prices on trucks, and that the price was given him. This is positively denied by defendant’s witnesses. But, even if it be true, as plaintiff says, that defendant did quote prices on that date, that did not close the contract, because admittedly plaintiff did not order the trucks on that date and did not know then that he would want the trucks because his bid had not been accepted by the Forcum-James Company.
 

 
 *175
 
 Plaintiff’s failure to get delivery of the trucks was due to his own fault and not to the fault of defendant. It was due to no fault of the defendant that it could not accept plaintiff’s offer to purchase the trucks for immediate delivery, nor was it defendant’s fault that they could not be obtained prior to the date on which plaintiff’s contract with Forcum-James was can-celled.
 

 Plaintiff introduced and filed in evidence a letter written to him by the defendant dated September 3, 1941. This letter was written in reply to one plaintiff had written to defendant on September 2, plaintiff’s letter reading as follows:
 

 “Sirs;
 

 “As you will recall we entered into an agreement on April 8th, 1941, whereby you were to deliver to me as many as ten new Ford Dump Body Trucks at my convenience.
 

 “Approximately three weeks ago I telephoned you in regard to the above agreement and asked that the trucks be delivered.
 

 “You then stated that you were unable to deliver the trucks at that time. You suggested that two weeks be given you within which to perform and deliver the ten new trucks. I agreed to grant your request for the two weeks additional time, which is already one week past due.
 

 “I am asking that you deliver the trucks as agreed within the next two days for I must have them in order to fulfill my contract.
 

 “Very truly yours,
 

 “(signed) T. H. Martin”
 

 In view of all the conditions and circumstances surrounding this case, this letter is quite interesting for two reasons. In the first place, plaintiff definitely relied on the agreement of April 8, 1941, “whereby you were to deliver to . me as many as ten new Ford Dump Body Trucks at my convenience”.
 

 In the second place, in the last sentence of the letter plaintiff asked that defendant deliver the trucks “within the next two days for I must have them in order to fulfill my contract”.
 

 This letter was dated September 2, and plaintiff alleged, and the documentary evidence shows, that his contract with For-cum-James was cancelled on August 30, 1941, so that plaintiff could not have wanted the trucks on September 2 in order to fulfill his contract with that company, and his claim for damages is based upon his failure to fulfill that contract, out of which he alleged he would have made a profit amounting to $12,500.
 

 The defendant replied to this letter on September 3, admitting its inability to deliver the trucks when ordered, and it is true, as counsel suggest, that defendant did not specifically mention that “this failure was due in any sense to lack of cooperation on the part of plaintiff or to plaintiff’s failure to timely provide adequate specifications”. But that was implied, because defendant specifically referred to previous conversations which its representative had had with plaintiff, and, as we have said, in those conversations defendant had repeatedly asked plaintiff to furnish speci
 
 *177
 
 fications, etc., which plaintiff had not done, and had informed plaintiff that the trucks could not be delivered momentarily. There was nothing in defendant’s letter of September 3 admitting or indicating that it had unconditionally accepted plaintiff’s order for the trucks. In that letter defendant indicated that there were certain kinds of trucks then available, but that it did not know that these trucks would be acceptable. We quote the following extract from that letter:
 

 “We did, however, state to you just the other day that we could deliver 1942 model trucks to you within approximately three weeks and perhaps this is the cause of the •confusion on that point.
 

 “Please let us have your wishes regarding the acceptance of the trucks
 
 available
 
 and with.additional prices or state whether or not you would like for us to withhold filling of your order until 1942 models can be supplied.”
 

 Defendant sold the seven used trucks for $1,135. The testimony shows that this was all they were worth on the market. There was judgment in favor of plaintiff for this amount. As to this item, counsel for plaintiff say the judgment should have been for $3,000. They say in their brief at page 40: “The amount of the refund is definitely fixed in the sum of $3,000.00, the value of the trucks surrendered, as is shown by the receipt.”
 

 The receipt does not fix the true or market value of the trucks. But, in so far as the defendant is concerned, it does fix the trade-in value .in case the plaintiff should purchase as many as 10 new trucks, and Mr. Howell, of the Jackson Motor Company, testified that the trade-in value of plaintiff’s used trucks was approximately $3,000. Mr. Howell testified that, a short time before plaintiff was negotiating with defendant for the purchase of new trucks, plaintiff communicated with him (Howell), stating that he was in the market for 10 new trucks, and that he wanted to trade in eight used trucks on them. Mr. Howell stated that he inspected plaintiff’s eight used trucks, and that he made Mr. Martin a price of $12,955 for 10 new trucks and agreed to allow him a credit of $3,000 for the eight used trucks which Martin had showed him. Seven of these were 1938 model Fords with hydraulic dump bodies. These were the seven used trucks which plaintiff deposited with defendant on or about April 8, 1941, and which defendant subsequently sold. The other truck which Martin showed Mr. Howell was described as a long wheel-base 1936 model. Whether the trade-in valúe of that truck was as much as the trade-in value of each of the other seven trucks is not disclosed by the record, but evidently it was worth something. That fact that Mr. Howell agreed to allow Mr. Martin $3,000 for the eight used trucks shows that Mr. Howell and the representative of Dutton Motors, Inc., were not in exact accord as to the trade-in value of the seven old trucks. But they were substantially in accord. It may be that the 1936 model truck was not worth as much as the 1938 models.
 

 Now the question is whether, under all the circumstances connected with
 
 *179
 
 this case, the plaintiff is entitled to recover of defendant $3,000, the trade-in value of his used trucks, or whether he is entitled to recover only $1,135, the amount for which defendant sold them. The trial judge thought that, since it was shown that $1,135 was all the seven trucks were worth on the market, plaintiff was entitled to judgment for that amount but nothing more.
 

 We think the judge erred. When the negotiations between plaintiff and the defendant motor company finally came to an end, the defendant company could not restore the trucks to plaintiff because it had sold them, and its contention is, and the trial judge held, that, since the trucks could not be restored to plaintiff, defendant’s liability to plaintiff was limited to the amount which defendant received for them. By selling the trucks defendant made it impossible for plaintiff to get the benefit of the trade-in value of his trucks, which he might have been able to do if the trucks had been restored to him. And whether the trucks were actually worth $3,000 or not makes no difference in so far as defendant’s liability is concerned, for the facts are that they did have a trade-in value of $3,000, and plaintiff might have realized that much for them in a trade.
 

 It is common practice for dealers, in selling new motor vehicles, to take in used units and to fix a trade-in value therefor, and the testimony shows that the dealer ordinarily does not expect to realize as much for the unit taken in as he allowed for it as a credit on the purchase price of the new vehicle. If he loses on the old car, he realizes less profit on the sale of the new one. But to the purchaser the unit traded in is worth, in dollars and cents, exactly what the dealer allows for it as a credit on the price of the new vehicle.
 

 Dutton Motors,,Inc., sold the used trucks according to custom, acting in good faith. If it had not sold the trucks, they would, of course, have been returned to the plaintiff when the negotiations for' the purchase of new trucks came to an end. By selling them it has made it impossible for the plaintiff ever to realize the trade-in value of them. It would be inequitable to allow plaintiff no more than the amount which was actually realized by the sale of the trucks.
 

 In Hanlen v. Crumley, La.App., 12 So. 2d 845, the plaintiff agreed to purchase a new car from the defendant and turned in his old car, and the dealer agreed to allow him a credit of $400 on the purchase price-of the new car. The sale was never made, because Hanlen did not call for the new car until after the government had prohibited the sale' of new cars. Hanlen brought suit for $400, but the Court of Appeal, Second Circuit, allowed him to recover only $250, the price the dealer obtained for the used car.
 

 There is a distinction between that case and the one at bar. In that case the ■used car could not have had a trade-in value at the time Hanlen called for the new car for the reason that new cars could not be purchased, the sale of new cars being prohibited at that time. The old car could not then be used as a trade-in.
 

 
 *181
 
 For the reasons assigned, the judgment appealed from is amended so as to increase the amount of the award to plaintiff from $1,135 to $3,000, and as thus amended it is
 
 affirmed;
 
 the defendant to -pay all costs.